IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:11-CT-3022-FL

| | | |
|---|---|---|
| MARK ANTHONY MILLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| SEBASTIAN BROWN | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the court on defendant's motion for summary judgment (DE 64) pursuant to Federal Rule of Civil Procedure 56, which was fully briefed. In this posture, the issues raised are ripe for adjudication. For the foregoing reasons, the court grants defendant's motion for summary judgment.

**STATEMENT OF THE CASE**

On February 3, 2011, plaintiff filed this action pursuant to 42 U.S.C. § 1983 against defendant and Warden Gerald Branker ("Branker") alleging that they acted with deliberate indifference to his serious medical needs and used excessive force against him in violation of the Eighth Amendment to the United States Constitution.

Defendant and Branker subsequently filed individual motions to dismiss, arguing that plaintiff failed to state a claim upon which relief may be granted. In the interim, plaintiff filed a motion to amend, which the court granted. The court also allowed plaintiff to voluntarily dismiss, without prejudice, pursuant to Federal Rule of Civil Procedure 41(a)(1) both his action against Branker and his claim against defendant alleging deliberate indifference to his serious medical

needs. Because plaintiff voluntarily dismissed his action against Branker, the court denied as moot Branker's motion to dismiss. The court also denied defendant's motion to dismiss.

Defendant subsequently filed a second motion to dismiss, arguing that plaintiff failed to state an Eighth Amendment claim for excessive force, which the court denied on June 4, 2013. The court's June 4, 2013, order also set forth a case management order which included deadlines for conducting discovery and filing dispositive motions.

On September 13, 2013, defendant filed a motion for summary judgment arguing that plaintiff is unable to establish a constitutional violation. Defendant also asserts the affirmative defense of qualified immunity. The issues raised were fully briefed.

**STATEMENT OF FACTS**

For ease of reference, a pertinent portion of the statement of facts by plaintiff as set forth in the court's August 22, 2012, order, is restated here:

> Viewing the facts in the light most favorable to plaintiff, plaintiff makes the following allegations. On December 14, 2007,[1] plaintiff was transferred from Pasquotank Correctional Institution to Central Prison. Plaintiff had been assaulted by staff at Pasquotank, and was again assaulted by staff when he arrived at Central Prison.
>
> After the assault, plaintiff was taken to medical where he was strapped to a bed and [defendant] injected an unknown substance into his arm through a needle. Plaintiff then passed out. When plaintiff awoke, he "weighed 161 pounds, but prior to being injected . . . weighed 234 pounds." Am. Compl. p. 2. Plaintiff further states that he has a mark on his tongue that goes down his throat and that his taste buds "are not right." Id. Plaintiff also states that his stomach

---

[1] Plaintiff states that the alleged excessive force/forced medication incident occurred on December 14, 2007, when he was injected with an unknown substance. However, upon a review of plaintiff's medical records, the records reflect that the only intramuscular administration of medication occurred on December 15, 2007. Brown Aff. ¶ 14 and Ex. 6. Accordingly, the court assumes that the alleged forced medication occurred on December 15, 2007.

2

and digestive system do not function the same. Id. Plaintiff further complains about a lump on his rectum that a nurse diagnosed as hemorrhoids. Plaintiff states that the medical staff knew that his condition was not hemorrhoids, but "tried to hide what they saw and felt." Id. p. 3.

Now before the court is a more complete account of the facts of this case, which include the following facts.

Defendant was at all relevant times herein a registered nurse employed with the North Carolina Department of Corrections at Central Prison Hospital Mental Health Services ("CPMH"). Brown Aff. ¶¶ 2, 4-6.

In October 2007, while housed at Pasquotank Correctional Institution ("Pasquotank"), plaintiff went four days without eating and ceased responding to staff verbally. Brown Aff. ¶ 7 and Ex. 3. Prison officials transported plaintiff to Albemarle Hospital where he was examined by a physician who gave plaintiff a single intramuscular dose of Haldol on the assumption that he may be suffering from schizophrenia exacerbation. Id. Defendant did not provide treatment for plaintiff at Albemarle Hospital. Brown Aff. ¶ 7. On October 27, 2007, plaintiff was transferred to Central Prison Hospital Mental Health Services ("CPMH") and admitted. Id. ¶ 7 and Ex. 3.

While at CPMH, plaintiff underwent neuropsychological testing which showed that he was malingering and exaggerating his cognitive deficits. Id. Plaintiff was discharged from CPMH on November 13, 2007, and was transferred to Pasquotank. Id.

At Pasquotank on December 10, 2007, Andre H. Williams, plaintiff's case manager, submitted a mental health services referral for plaintiff indicating that plaintiff appeared to have lost memory and did not appear to be cognizant of his present situation. Id. ¶ 8 and Ex. 4. On the same

3

date, Phyllis Burd, R.N., submitted a mental health services referral stating that plaintiff was not talking and was unable to complete activities of daily living. Id.

On December 11, 2007, at 1:30 p.m., Nurse S.D. Ray, R.N. ("Nurse Ray"), noted that plaintiff had not eaten in four days and that two mental health referrals had been made by other members of the custody staff. Id. ¶ 9 and Ex. 4. Nurse Ray observed that plaintiff appeared to be a healthy male who responded to his name but failed to respond to questions with regularity. Id. To the extent plaintiff responded, his responses were given with a flat affect and were either incoherent or nonsensical. Id. Nurse Ray observed that plaintiff was oriented to person only, that his ability to maintain daily activities was diminished, his gait unsteady, and that he appeared to be unclean and unkempt. Id. Nurse Ray referred plaintiff to CPMH. Id.

On December 14, 2007, after four days of close observation by various health care providers, Nurse B. Denson ("Nurse Denson") observed that plaintiff was pacing in his cell and mumbled when he tried to communicate. Id. ¶ 10 and Ex. 5. Plaintiff refused to be weighed, to have his vital signs taken, or to shower. Id. Nurse Denson noted an intent to continue to monitor plaintiff, to educate him on the importance of showering, and to page Robert Lamelle, Psy.D., ("Dr. Lamelle") the psychology program manager at Pasquotank, to inform him of plaintiff's status. Id.

At approximately 2:30 p.m. on the same date, Dr. Lamelle saw plaintiff and noted that plaintiff was non-verbal, drooled on himself, and was negativistic when custody staff attempted to move him. Id. ¶ 11 and Ex. 5. Dr. Lamelle consulted with psychologist Dr. George Townsend, M.D. ("Dr. Townsend") and made arrangements to have plaintiff involuntarily transferred to CPMH on an emergent basis because plaintiff posed a danger to himself due to his refusal to eat, he was non-verbal, he had possible thought-blocking, and he was drooling on himself. Id.

Plaintiff arrived at the emergency department at Central Prison at approximately 10:10 p.m. and was screened for admission to CPMH. Id. ¶ 12 and Ex. 5. Dr. Habib Masood, M.D. ("Dr. Masood") examined plaintiff and was unable to obtain plaintiff's medical history because plaintiff was nonverbal. Id. Dr. Masood's assessment was that plaintiff was agitated, refused to eat, was non-verbal and had a history of malingering and anti-social personality disorder. Id. Dr. Masood admitted plaintiff to CPMH for further evaluation and management. Id.

On December 15, 2007, at approximately 2:00 a.m., Nurse Chavis, a mental health unit nurse, contacted Dr. Masood for a telephone consultation regarding her concern that plaintiff may be dehydrated. Id. ¶ 13 and Ex. 6. Dr. Masood advised Nurse Chavis that plaintiff should be returned to the emergency department at Central Prison for fluid challenge (administration of intravenous crystalloid fluids such as normal saline). Id. Plaintiff arrived at the Central Prison emergency department at approximately 2:45 a.m. Id. ¶ 14 and Ex. 6. Medical professionals administered saline and Nurse Lewis administered Ativan to treat plaintiff's restlessness. Id. Dr. Masood also conducted an examination of plaintiff at 5:15 a.m. Id.

Later in the morning on December 15, 2007, Nurse Violet Smart ("Nurse Smart") examined plaintiff, and noted that he was six feet tall and weighed one hundred ninety-nine (199) pounds. Id. ¶ 15 and Ex. 7. Nurse Smart assessed plaintiff with an alteration in nutrition less than body requirement related to secondary gain.[2] Id. Nurse Smart's intervention plan for plaintiff included: (1) place him on therapeutic seclusion; (2) monitor his actions every thirty (30) minutes; (3) assess his input and output; (3) encourage him to eat; and (4) obtain weight checks on a weekly basis. Id.

---

[2] Secondary gain is an external motivator for symptoms, such as obtaining drugs, avoiding a jail sentence, or obtaining medical care that would otherwise not be provided. Id.

Dr. Ridgeway, a psychiatrist gave the following inpatient admission orders by telephone: (1) regular diet; (2) orthostatic vital checks[3] every day for three days, thereafter checks on a weekly basis; (3) therapeutic seclusion with checks every fifteen (15) minutes due to psychotic behavior and unpredictability; (4) limited property to mattress, suicide precaution (tear-resistant) blanket and smock; (5) Acetaminophen; (6) milk of magnesia; (7) house antacid; (8) monitor intake and output for three days; (9) obtain weekly weight; and (10) Vistaril (sedative to treat anxiety and tension). Id. ¶ 16 and Ex. 7. Dr. Townsend additionally examined plaintiff that same day and assessed that plaintiff's symptoms either were related to psychosis or malingering. Id. ¶ 17 and Ex. 7.

Beginning on December 15, 2007, defendant observed plaintiff in his cell at fifteen (15) minutes increments pursuant to the therapeutic seclusion order for the duration of his shift. Id. ¶ 18 and Ex. 8. Between the end of defendant's shift on December 15, 2007, and the beginning of his shift the next day, it was noted by other health care providers that plaintiff did not eat breakfast and refused lunch. Id. ¶ 19 and Ex. 9. Defendant continued his fifteen (15) minute increment observations of plaintiff during his shifts on December 16, 2007, and December 17, 2007. Id. ¶¶ 20, 22 and Exs. 9, 10.

At approximately 5:00 p.m. on December 17, 2007, Dr. Danuta Jagla Schudel, a staff psychiatrist, examined plaintiff and noted that he had not eaten since his arrival in the emergency room. Id. ¶ 22 and Ex 10. Between the end of defendant's shift on December 17, 2007, and the beginning of his shift on December 19, 2007, other health care providers noted that plaintiff did not eat breakfast and refused lunch. Id. ¶ 23. Plaintiff additionally refused medical staff's attempt to

---

[3] Orthostatic vital checks were performed to ensure that plaintiff was hydrated and medically stable, because he had a history of refusing meals. Brown Aff. ¶ 16.

record his vital signs and conduct lab work. Id. Dr. Townsend observed plaintiff on December 19, 2007, at approximately 2:16 p.m. and reported that he seemed "gamey" and should therefore continue on therapeutic seclusion with thirty (30) minute checks. Id. At approximately 7:30 p.m., defendant observed that plaintiff had an improved affect and mood, but that he continued to refuse to have his vital signs taken. Id. Plaintiff also ate his meals and drank his fluids. Id.

On December 21, 2007, Dr. Townsend ordered that plaintiff be discharged from therapeutic seclusion and placed on administrative isolation with checks every hour. Id. ¶ 25 and Exs. 13. Defendant continued to treat and observe plaintiff. Id. ¶ 26.

**DISCUSSION**

A.  Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. Anderson, 477 U.S. at 250.

B.  Analysis

Defendant raises the defense of qualified immunity against plaintiff's § 1983 action. Government officials are entitled to qualified immunity from civil damages so long as "their conduct

7

does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In other words, a government official is entitled to qualified immunity when (1) the plaintiff has not demonstrated a violation of a constitutional right, or (2) the court concludes that the right at issue was not clearly established at the time of the official's alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

      1.     Excessive Force

Plaintiff contends that defendant used excessive force against him in violation of the Eighth Amendment when defendant injected plaintiff with an unknown substance on December 15, 2007. The Eighth Amendment prohibits the "unnecessary and wanton infliction of pain" which constitutes cruel and unusual punishment. Whitley v. Albers, 475 U.S. 312 (1986). The excessive force inquiry has an objective prong and a subjective prong. Under the objective prong, the focus is not on the severity of any injuries inflicted, but rather on "the nature of the force," which must be "nontrivial." Wilkins v. Gaddy, 559 U.S. 34 (2010). The objective component can be met by "the pain itself," even if the prisoner has no "enduring injury." Williams v. Benjamin, 77 F.3d 756, 762 (4th Cir. 1996).

As for the subjective component, plaintiff must show that the "prison officials maliciously and sadistically used force to cause harm." Hudson v. McMillian, 503 U.S. 1, 8 (1992). The key question is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Whitley, 475 U.S. at 320-21 (internal quotation marks omitted).

8

Beginning with the objective prong of the Eighth Amendment test, plaintiff states that the alleged injection on December 15, 2007, caused him to experience a weight loss in excess of seventy (70) pounds. Plaintiff also states that the injection resulted in "mark[s] on [his] tongue that [went] all the way down [his] throat," problems with his taste buds, digestive issues, and a lump on his rectum. Compl. pp.3-4. In response, defendant, through his motion for summary judgment, presented evidence establishing that plaintiff's weight loss was due to plaintiff's refusal to eat both immediately proceeding his admission to CPMH and while at CPMH. Additionally, plaintiff's medical records do not reflect any digestive issues, marks on plaintiff's tongue, or lump on plaintiff's rectum during his December 15, 2007, to February 27, 2008, stay at CPMH. Brown Aff. ¶ 6. Nor has plaintiff presented any evidence to support a finding that the administration of medication to plaintiff on or around December 15, 2007, caused the alleged weight loss or the other medical conditions described by plaintiff. Thus, plaintiff has not satisfied the objective prong of the Eighth Amendment test.

The court now turns to the subjective prong of the Eighth Amendment test – whether defendant maliciously and sadistically used force to cause harm. The record reflects that plaintiff arrived at the Central Prison emergency department at 10:10 p.m. on December 14, 2007. Brown Aff. ¶ 12 and Ex. 5. The record further reflects defendant did not work in the Central Prison emergency department, and was not present when the saline and Ativan were administered. Id. and ¶ 14. Plaintiff has not presented any evidence to the contrary. Thus, there is no evidence that defendant used excessive force against plaintiff in connection with the administration of medication

9

or under any other circumstances.[4]  Based upon the foregoing, Defendant is entitled to qualified immunity as his conduct did not violate any clearly established statutory or constitutional rights of which a reasonable person would have known.

2. Forced Medication

Plaintiff argues that defendant forcibly medicated him with an unknown substance on December 15, 2007. An inmate has a "significant liberty interest in avoiding the unwanted administration of antipsychotic drugs." Washington v. Harper, 494 U.S. 210, 221-22 (1990); see also Sell v. United States, 539 U.S. 166, 177 (2003) (extending Harper to persons confined because they are incompetent to stand trial and permitting forced medication in order to render a defendant competent to stand trial). However, in Harper, the Court held that a state may constitutionally "treat a prison inmate who has a serious mental illness with anti-psychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." Id. at 227. In making its determination, the Court concluded that "the decision to administer antipsychotic medication over an inmate's objection comports with due process if . . . made in the exercise of professional medical judgment and [in] an emergency situation where the inmate posed a danger to himself or others." Dancy v. Simms, 116 F. Supp.2d 652, 655 (D. Md. 2000), aff'd, 51 F. App'x 906 (4th Cir. Dec. 2, 2002).

In this case, plaintiff asserts that the Ativan and saline injection administered on December 15, 2007, were not medically necessary. In support, plaintiff directs the court to his medical records for the time period of October 27, 2007, through November 13, 2007, which state that he had "no

---

[4] Defendant states that he is aware of only one occasion when custody officers forcibly restrained plaintiff by plaintiff in four-point leather restraints. Brown Aff. ¶ 38. Defendant, however, states that he was not working at the time of the alleged incident. Id.

10

prior mental health history in Department of Correction records" and that the "[r]esults of the neuropsychological testing indicated that [he was] malingering and exaggerating his cognitive deficits." Pl.'s Resp. (DE 68) Ex. 3, pp. 4-5. At that time, Dr. Olgierd A. Pucilowski determined that plaintiff did not "require any psychotropic medication" and discharged him from CPMH. Id. p. 5.

Although plaintiff's medical records state that medical treatment was not necessary on November 13, 2007, plaintiff's subsequent medical records reflect a decline in plaintiff's mental health. For instance, on December 10, 2007, plaintiff's case manager submitted a mental health services referral for plaintiff indicating that plaintiff appeared to have lost memory and did not appear to be cognizant of his present situation. Brown Aff. ¶ 8; Ex. 4. During the same time period, plaintiff's medical records indicate that he refused to eat. Id. ¶¶ 9-12. Plaintiff then was transferred to the Central Prison Emergency Department on December 14, 2007, because he posed a danger to himself due to his refusal to eat, he was non-verbal, he had possible thought-blocking, and he was drooling on himself. Brown Aff. ¶¶ 11-12 and Ex. 5. During an evaluation of plaintiff upon his arrival to the Central Prison Emergency Department, a physician ordered that plaintiff be given two milligrams of Ativan for restlessness, and two liters of saline for dehydration. Brown Aff. ¶¶ 13-14 and Ex. 6. Plaintiff's condition then began to improve and he was discharged from CPMH on February 27, 2008. Id. ¶ 26.

Based upon the foregoing, the alleged involuntary administration of saline and Ativan were medically necessary in the emergency department to treat plaintiff's dehydration and restlessness. This decision to administer the substances was made in the exercise of professional medical judgment in response to concerns about plaintiff's pulse rate and lack of responsiveness. Plaintiff

11

presented no evidence contradicting the medical evidence. Additionally, the record reflects that defendant was not involved in any way with the administration of the saline or Ativan. For these reasons, the court finds that plaintiff has failed to establish a constitutional violation, and that defendant is entitled to qualified immunity.

Finally, to the extent plaintiff raises new claims in the various pleadings he submitted, the court finds that plaintiff is precluded from raising these claims at this juncture. Aside from the motions to amend reflected on the court's docket, which this court has considered and ruled upon, plaintiff has not formally filed a motion to amend his complaint to include any potential claims asserted in his miscellaneous filings. For this reason, the court does not consider any potential claims asserted in plaintiff's miscellaneous filings. See United States ex rel. DRC, Inc. v. Custer Battles, LLC, 472 F. Supp. 2d 787, 796 (E.D. Va. 2007) (quoting Coleman v. Quaker Oats Co., 232 F.3d 1271, 1292 (9th Cir. 2000)), aff'd 562 F. 3d 295 (4th Cir. 2009).

## CONCLUSION

Based upon the foregoing, defendant's motion for summary judgment (DE 64) is GRANTED. The Clerk of Court is DIRECTED to close this case.

SO ORDERED, this the 20th day of December, 2013.

_____
LOUISE W. FLANAGAN
United States District Judge